
IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF SOUTH CAROLINA

FLORENCE DIVISION

| | | |
|---|---|---|
| Zachary Strickland, Jerry I. Strickland and Marsha Strickland<br>          Plaintiffs | ) ) ) ) | |
| v. | ) | Civil Action No.: 4:00-1391-~~23~~ 27 |
| | ) | |
| Ford Motor Company and Fair Bluff Motors, Inc.<br>          Defendants | ) ) ) ) | |

## MEMORANDUM IN SUPPORT OF MOTION IN LIMINE TO EXCLUDE THE TESTIMONY OF PROFESSOR JOHN FREEMAN

Defendant Ford Motor Company ("Ford") states as follows in support of its Motion In Limine To Exclude The Testimony Of Professor John Freeman.

### I.        BACKGROUND

This product liability action arises from a May 9, 1997 vehicle collision near Aynor, South Carolina. Zachary Strickland, operating a 1997 Ford F-150 pickup truck, drove through a stop sign and collided with a medium duty 1994 GMC truck pulling a backhoe tractor. Strickland was ejected from his truck and sustained serious injuries. On May 9, 2000, Zachary and his parents filed this action against Ford Motor Company alleging that the brakes, seat belt and door latches on the F-150 are defective and unsafe, and that the accident and Zachary's injuries were caused by Ford's negligent, reckless and willful conduct. *Complaint,* ¶9.

Plaintiffs have designated Professor Freeman, a law professor at the University of South Carolina, to testify concerning Ford's alleged misconduct in responding to discovery in this and other actions. Professor Freeman accuses Ford and its lawyers of various bad acts relating to the

279

discovery process. The proffered testimony is improper character evidence under Fed. R. Evid. 404, and is otherwise inadmissible. Ford's conduct in responding to discovery is neither relevant nor admissible at trial. Discovery disputes are resolved by motion prior to trial, and are not a matter for resolution by the jury. Even if such evidence were somehow admissible, offering such evidence through Professor Freeman would improperly usurp the exclusive role of the Court in setting forth the law and the role of the jury in determining the propriety of Ford's conduct. The proffered testimony will not assist the trier of fact in understanding the evidence or in determining a fact in issue, and is inadmissible under Fed. R. Evid. 702 and 404. However distinguished Professor Freeman may be as a law professor, his proposed testimony has no place before a jury of this Court.

## II.    PROFESSOR FREEMAN'S ANTICIPATED TESTIMONY

Ford deposed Professor Freeman on June 30, 2004. As described by Professor Freeman, the crux of his proposed trial testimony concerns the conduct of Ford's inside and outside lawyers, and Ford employees, in responding to discovery in this action. (Dep. Trans. p. 58, attached as Exhibit A). If permitted, Professor Freeman will offer the following "opinions":

- Robert Wheelock, an employee of Ford, perjured himself in his deposition and presented a false Affidavit to the Court. (Dep. Trans. p. 43-44, 67)

- Mohammed Ayub, an engineer with Ford, perjured himself when he stated he did not know about certain crash tests conducted by Ford. (Dep. Trans. p. 46, 67)

- Ford committed serious discovery abuse in this case concerning its disclosure and production of documents related to the Ford F-150 door latch (Dep. Trans. p. 67)

2

- Ford engaged in improper acts by "buying secrecy" with a Protective Order in a matter style *Bringhurst v. Ford Motor Company.* (Dep. Trans. p. 73-74)

- Ford improperly invoked the attorney-client privilege to defeat plaintiff's investigations. (Dep. Trans. p. 77-78)

- Interrogatory responses by Ford employees Kimberly Bowen-Adair and Jay Logel (which were the subject of a separate discovery motion filed by plaintiffs and resolved in Ford's favor) were evasive and/or non-responsive. (Dep. Trans. p. 111)

- Ford's outside counsel, Joel Smith, withdrew from representing Ford in this action because of his alleged concern with Ford's misconduct. (Dep. Trans. p. 46)

Significantly, Professor Freeman bases his opinions in large part on the representations of plaintiffs' counsel made during approximately forty-five to fifty hours of conversation between them. (Dep. Trans. p. 66). In other words, Professor Freeman proposes nothing more than to restate the vitriolic arguments made by plaintiffs' counsel in pursuit of several largely unsuccessful discovery motions against Ford. Dissatisfied with the Court's rulings on those motions, plaintiffs improperly seek to renew their arguments under the guise of expert witness testimony. Such efforts should be rejected.

## III. ARGUMENT

The admissibility of expert testimony is a preliminary question to be determined by the Court, and the party offering expert testimony must establish the admissibility of the testimony and the qualifications of the expert witness. *See Fed. R. Evid. 104(a); Daubert v. Merrill-Low Pharmaceuticals,* 509 U.S. 579, 597 (1993); *Kuhmo Tire Co., Ltd. v. Carmichael,* 526 U.S. 137 (1999). Fed. R. Evid. 702 provides that "if scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training or education, may testify thereto

in the form of an opinion or otherwise, if the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case." Thus the Court must determine at the outset whether a witness' proffered testimony meets these narrow requirements. *Daubert,* 509 U.S. at 591. The Court's gatekeeping function applies not only to scientific knowledge, but to any testimony based on "technical" or "other specialized knowledge". *Kumho Tire Company,* 526 U.S. at 141. The gate should be closed as to Professor Freeman.

### A. Professor Freeman's Proposed Testimony is Inadmissible Character Evidence Under Rule 404

Plaintiffs have designated Professor Freeman to testify concerning, among other things, "the propriety of Ford's actions or inaction relating to . . . litigation discovery in the context of the standards of truthfulness, fair dealing, punctuality, and professionalism under the Rules of Professional Conduct," and Ford's alleged "discovery abuse and Ford's general dilatory discovery tactics in this and other similarly situated litigation." *Plaintiffs' Supplemental Rule 26 Expert Disclosure,* attached as Exhibit B. The proffered testimony is not relevant to any material issue of fact concerning the design or performance of the Strickland pickup truck and is, at best, improper and unfounded character evidence.

Pursuant to Fed. R. Evid. 404(a), absent some exception unavailable here, "evidence of a person's character or a trait of character is not admissible for the purpose of proving action in conformity therewith." Similarly, pursuant to Fed. R. Evid. 404(b), "evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith.

This case concerns the design and performance of the Strickland F150 pickup truck; Zachary Strickland's role in causing the May, 9, 1997 accident; and the cause of Zachary

Strickland's injuries. The conduct of Ford and its counsel *in discovery* in this and other actions is simply not relevant to the design and manufacture issues to be decided by the jury, and such evidence should be excluded.

To the extent this evidence of supposed bad acts is offered in support of plaintiffs' claim for punitive damages, it is likewise inadmissible. The law is now well-settled that "[a] defendant's dissimilar acts, independent from the acts upon which liability was premised, may not serve as the basis for punitive damages." *State Farm Mutual Insurance Co. v. Campbell,* 123 S.Ct. 1513, 1523 (2003). A defendant is to be punished only for the particular conduct that harmed the plaintiff, "not for being an unsavory individual or business." *Id.* "Due process does not permit courts, in the calculation of punitive damages, to adjudicate the merits of other parties' hypothetical claims against a defendant under the guise of the reprehensibility analysis . . . ." *Id. See also Jimenez v. DaimlerChrysler Corp.,* 269 F.3d 439, 450 (4th Cir. 2001).

In *Jimenez,* plaintiffs alleged their son was killed in a 1994 accident because of a defective rear liftgate latch on a 1985 Dodge Caravan. As alleged here against Ford, plaintiffs alleged that DaimlerChrysler was aware that the latches on the Caravan were defective, and that it attempted to conceal the problem from the National Highway Transportation Safety Administration and the public. At trial, the jury returned its verdict for the plaintiff, and awarded substantial compensatory and punitive damages.

In response to DaimlerChrysler's appeal of the punitive damages award, plaintiffs argued, among other things, that the award of punitive damages was proper based on evidence of Chrysler's post-design conduct, including its alleged efforts to hide and conceal the latch problems rather than recall the vans. 269 F.3d at 444.

DaimlerChrysler, in response, argued that in assessing Chrysler's conduct, the jury should have been limited to Chrysler's state of mind at the time the van was designed, not its conduct subsequent to the sale of subject van. *Id.* The Fourth Circuit agreed with DaimlerChrysler, and set aside the award of punitive damages.

> [I]n this case we must determine whether the jury was presented with evidence that showed it was highly probable that DaimlerChrysler acted in a willful, wanton, or reckless manner at the time of the conduct supporting the claims of negligent design or strict liability - i.e., during the 1984-85 time period when the liftgate latch was designed and when the Caravan was delivered from the factory. . . .
>
> The Estate argues more forcefully, however, that the post-design conduct relates back to prove consciousness of wrongdoing, just as would any coverup . . . But to succeed in this effort, the Estate must establish that the post-design conduct clearly and convincingly points to DaimlerChrysler's consciousness of wrongdoing *at the time it designed the minivan and the liftgate latch* and not to consciousness of wrongdoing thereafter, such as wrongful failure later to initiate a recall.

*Id.* at 451 (emphasis in original).

Here, Professor Freeman proposes to address conduct that occurred years after the design of the F150 door latch and the sale of the Strickland vehicle. Such testimony concerns conduct independent of the conduct on which liability is premised and, under *Jimenez* and *State Farm,* the testimony cannot serve as the basis for punitive damages.

Any evidence as to Ford's conduct in the course of discovery in this or other cases is wholly unrelated to plaintiffs' allegations that the F-150 truck operated by Strickland in May, 1997 was defectively designed and manufactured, or that the alleged defects caused Strickland's injuries. Such evidence is not relevant, and should be excluded, whether offered by an expert witness or in some other fashion.

*Daubert* cautions that in conducting its gatekeeping role, trial courts should be mindful of other restrictions on the admissibility of evidence, such as Fed. R. Evid. 403, because "expert evidence can be powerful and quite misleading." *Daubert,* 508 U.S. at 595. The proffered character evidence from Professor Freeman, if not inadmissible outright, should be excluded under Rule 403 because the probative value of the evidence is substantially outweighed by the danger of unfair prejudice, confusion of the issues or misleading the jury, and by considerations of undue delay and waste of time.

**B.  Professor Freeman's Proposed Testimony Improperly Usurps The Role Of The Jury And The Court**

In assessing the admissibility of proffered expert testimony, the trial court must determine whether the testimony will usurp its own role in instructing the jury on the law, or usurp the role of the jury in applying that law to the facts before it. *U.S. v. Lumpkin,* 192 F.3d 280, 289 (2d Cir. 1999). An expert witness may not, under the guise of helpfulness, tell the jury what result to reach or communicate a legal standard. *In re Rezulin Products Liability Litigation,* 309 F.Supp.2d 531, 541 (S.D.N.Y. 2004). Rule 702 bars expert witnesses from usurping the role of counsel in making arguments at trial, the role of the jury in interpreting evidence, and the role of the Court in determining the law applicable to the case. *Id.* Professor Freeman's proffered testimony runs afoul of each restriction.

**1.  Professor Freeman's Proposed Testimony Improperly Usurps The Role Of The Jury**

Professor Freeman proposes to testify that Ford's lawyers and employees engaged in misconduct in discovery. Even assuming evidence on this issue is somehow admissible, Professor Freeman improperly seeks to usurp the role of the jury in assessing the propriety of Ford's conduct and determining the credibility of the witnesses.

Among other things, Professor Freeman proposes to testify that two Ford employees,

Robert Wheelock and Mohammad Ayub, perjured themselves during discovery.

> A     I think Ford's been guilty of discovery abuse
> – serious discovery abuse in this case concerning
> the door handle, the document disclosure and
> concerning efforts to place evidence out of the reach
> of plaintiff's counsel. That's a headline
>
> Q     Are there subtitles to that headline
>
> A     Various manifestations of what I consider to
> be improper behavior. I mention perjury. Mr. Ayub
> has lied, has admitted he lied....
>
> Q     When you say he admitted he lied, are you
> referring to the transcript you read earlier where he
> admitted he was incorrect in an earlier deposition.
>
> A     Yep. Exactly. Mr. Wheelock I believe lied
> in his deposition and he presented a false affidavit
> to the Court, and I also fault him for supplying false
> and fraudulent information to Mr. Smith for Mr.
> Smith's reliance in the March 27 letter and as
> counsel for Ford. (Dep. Trans. p. 67).

Professor Freeman's accusations are unfounded, and are nothing more than a rehash of

the unsuccessful arguments of the plaintiffs' counsel in pursuing a supervised deposition

of Mr. Wheelock. *See Plaintiffs' Motion to Compel the Deposition of Robert Wheelock*

*Under Court Supervision in Florence South Carolina,* attached as Exhibit C.

> COURT:     I'm not going to do that. There's been –
> There's no indication to me that that is a step that's
> necessary at this point. I think you just need to go take this
> deposition, I understand you're going to California, and we
> can arrange it where, you know we could get on a
> conference call during the deposition if y'all let me know
> when it is, because I don't want y'all to have a wasted trip
> to California. By the same token, I don't intend to be
> present for the entire deposition. (Hearing Trans. 05/19/04,
> p. 67, attached as Exhibit D.)

Moreover, the proposed testimony improperly usurps the role of the jury in making determinations of credibility.

If, as plaintiffs contend, Mr. Wheelock or Mr. Ayub lied about matters that will be at issue at trial, then it is the job of plaintiffs' counsel, not Professor Freeman, to make those lies known to the jury through impeachment or other proper procedural methods. It is not, however, the role of an "expert" to supplant plaintiffs' counsel and pronounce the employees liars based on his own review of their deposition testimony.

The law is likewise well-settled that an expert is prohibited from offering opinion evidence as to the credibility of a party. *See United States v. Cecil,* 836 F.2d 1431 (4th Cir. 1988); *H.C. Smith v. Outboard Marine Corp.,* 181 F.Supp.2d (W.D. Mich. 2002); *Lumpkin, supra.* In *Cecil,* the defendant appealed from the district court's ruling prohibiting expert testimony that the government's key witness had a "narcissistic personality disorder". The Fourth Circuit agreed, holding that Rules 701, 702 and 403 provide "assurance against the admission of opinions which merely tell the jury what results to reach, somewhat in the manner of the oath-helpers of an earlier day". *Cecil,* 836 F.2d at 1441. The court made clear that the determination of a witness's credibility is strictly for the jury, and opinions on credibility are for the jurors themselves to form. *Id.* at 1441-42.

Here, plaintiffs improperly seek to have Professor Freeman impose on the jury his personal view of the credibility of Ford employees, based on his understanding of the issues as explained to him by plaintiffs' counsel, as opposed to letting the jurors make their own credibility assessments based on the evidence presented at trial and the demeanor of the witnesses. Such testimony should be excluded.

## 2. Professor Freeman's Proposed Testimony Improperly Usurps The Role Of The Court

Having been largely unsuccessful in their vitriolic discovery motions against Ford, plaintiffs sought and found a more sympathetic ear in Professor Freeman. It is not his role, however, to judge Ford's discovery conduct.

If permitted, Professor Freeman will testify that Ford engaged in misconduct by allegedly failing to timely disclose certain documents, and by allegedly providing evasive and/or non-responsive answers to discovery.

> A   I fault Ford in-house lawyers for having either non-existent or miserably inadequate controls over documents concerning door handle defects or alleged defects. I think it is astounding and just outrageous that massive amounts of documents concerning a planned half-a-billion dollar investment in fixing a problem – though I'm aware that Ford later denied that there – and still denies that there was any problem at all. That these documents which are clearly relevant, which any first-year law student would understand to be clearly relevant to a F150 PN 96 door opening case were hidden for years by Ford and by hidden, I want to be explicit. Ford originally produced a CDR – CD not read/write but –

> Q   CD rom?

> A   CD rom disc in a non-searchable way, basically, pictures of documents which is for whatever reason there was software available that was not supplied to counsel. The representation was this is the door handle collection, this is what we got. I don't believe Kimberly Bowden-Adair and other similarly knowledgeable people at Ford could possibly have believed that to be true because they had to know about the PN96 problem. They had to know about the

6J08 problem, 6J01. They had to know that these documents existed. They had to know about the settlement documents. I believe they had the settlement documents, and instead, they hid those documents. (Dep. Trans. p. 67-69, l . 25-6).

A    . . . we've gotten Logel's interrogatory answers and Kimberly Bowden-Adair's interrogatory answers. And as a lawyer and as a law professor in the ethics area, I sit here and say does Ford really get it. You've – those orders – those interrogatories, as I understand, were sent out under court order – or with – pursuant to court permission, and what I find in there is evasion. I find not answering discovery requests by those people. Then I find them not even signing their own answers to interrogatories that are posed to them, but some stamp by Mr. Smith signing that. (Dep. Trans. p. 71-72).

Similarly, if permitted, Professor Freeman will testify that Ford's inside counsel violated various South Carolina professional guidelines, (Dep. Trans. p. 150-152), and that Ford's former outside counsel, Joel Smith, withdrew from representing Ford because he could not abide the unethical conduct.

A    . . . Joel writes actually two letters. One, and then he corrected the typo and the other one. I call these noisy notice of withdrawal letters, though he did not withdraw at this time, but he's laying the groundwork for a withdrawal. As you know, under 1.6, essentially you are not to divulge freely information given to you by your client. One of the rare instances when you can disclose information is where you believe that your client has engaged in improper acts and has involved you in the improper acts. And what you are allowed to do then under the comments of Rule 1.16 is what's called a

> noisy notice of withdrawal disavowing
> documents, withdrawing things, basically
> alerting the other side there are grave
> problems with this. And that's what he did
> on November 21, 2003, in my estimation,
> which he then followed with his withdrawal
> from the case on November 26. (Dep.
> Trans. p. 39-40).

Professor Freeman's unfounded accusations lack any support, and they are not

relevant to any issue to be decided by the jury. The same unfounded arguments have

previously been made by plaintiffs' counsel and rejected.

> MR. BELL:   . . . Prior to the hearing, Joel Smith told me
> that he sent, I believe, Deidre McCool to Dearborn to
> personally interview these engineers. We got a call from
> Joel Smith subsequent to that, and before your hearing, he
> said Ed, I'm really sorry, but they didn't do – Ford lied to
> me, they did not do the sweep, and we're sorry we accused
> you what you're doing. That's what led to the uncovering
> this investigation. So we get a promise we're going to get
> these things turned over. We get initially in October the
> first set of documents. Although Ford was required to do it
> in 30 days, they took almost five months to complete the
> discovery responses. The first set of documents, Kevin
> Dean looked at, you wouldn't believe what we found. We
> found this 14-D. We found several other documents, some
> of which had Jay Logel's name on it. Joel called – Kevin
> called Joel Smith and said Joel, have you seen these
> documents? He said no, I haven't looked at them. I know I
> was told we got some coming. He said, you better go look
> at them. According to Joel Smith, they immediately started
> looking at these documents, and it was at that time we got
> the call from Joel Smith saying he's going to have to
> withdraw as counsel, because there had been a
> misrepresentation to this Court, there had been a
> misrepresentation in the Affidavit, and there had been
> perjured testimony in a deposition . . .

> THE COURT: Well I'm sitting up here, and it chaps me
> because of all this stuff you're going into. I like to read
> things before I get in here so I have some idea what I'm
> dealing with. And you are talking about all kinds of things,
> making accusations, saying things as a fact, and it might be

so, but I don't know that to be the case. And it puts me in a tough situation to try to remember everything that you're going through right now, when its not in your brief. . . this thing about Joel Smith and he said Ford lied, you're making some pretty serious accusations . . .

MR. WILKERSON: If the Court please, with the Court's permission, there are too many cooks in the kitchen, I don't purport to argue the merits of the issue, but I rise for the sole purpose of addressing Mr. Bell's very elaborate and detailed jury argument to the Court, that he just presented to the Court, what he presented to be factual statements, starting from A to Z, getting to the point where he believes he's entitled to these things.

THE COURT: I understand. I'll let you put whatever you want on the record. I'm not going to consider any of that, because that is unfair to me, in trying to make a decision, and making factual assertions and accusations like that, I'm not going to consider anything that is not in the brief. (Exhibit D, Hearing Trans. 05/19/04, p. 20-21 & 29)

Whatever the accuracy of the allegations, it is black letter law that an expert witness is prohibited from offering legal conclusions on domestic law. *See, e.g., Burkhart v. WMATA,* 112 F.3d 1207, 1213-14 (D.C.Cir. 1996) ("Each courtroom comes equipped with a 'legal expert,' called a judge, and it is his or her province alone to instruct the jury on the relevant legal standards"; expert testimony consisting of legal conclusions cannot properly assist trier of fact in understanding the evidence or determining facts in issue."); *In re Initial Public Offering Sec. Litig.,* 174 F. Supp. 2d 61, 64-65 (S.D.N.Y. 2001) (collecting cases).

Professor Freeman's testimony has previously been excluded on just this basis. In *Dawkins v. Fields,* 354 S.C. 58, 580 S.E.2d 443 (2003), the Supreme Court of South Carolina affirmed the exclusion of an affidavit executed by Professor Freeman and offered in opposition to a motion for summary judgment on the grounds the affidavit contained primarily legal arguments. *Id.. 580 S.E.2d* at 437 ("While it is true that an opinion is not objectionable because

it embraces an ultimate issue to be decided by the trier of fact, Professor Freeman's affidavit inappropriately attempted to usurp the trial court's role in determining whether petitioners were entitled to summary judgment.") (citations omitted).

In *Adalman v. Baker Watts & Co.*, 807 F.2d 359 (4th Cir. 1986), the Fourth Circuit, *sua sponte*, addressed this question in the context of proffered testimony concerning the materiality of information withheld from an offering memorandum.

> The analysis here begins with the proposition that under our system it is the responsibility -- and the duty -- of the court to state to the jury the meaning and applicability of the appropriate law, leaving to the jury the task of determining the facts which may or may not bring the challenged conduct within the court's instruction as to the law.
>
> Under circumstances involving domestic law, this court can conceive of no circumstances which would shift this burden from the court to the jury, where the jury judgment would be influenced, if not made, on the basis of expert testimony which would undoubtedly follow the usual pattern of conflicting expert opinions.

807 F.2d at 366.

Professor Freeman's proposed testimony runs directly afoul of *Adalman*. Plaintiffs would have Professor Freeman define the law applicable to discovery (e.g. the "standards of truthfulness, fair dealing, punctuality, and professionalism under the Rules of Professional Conduct applicable to lawyers involved in matters in Federal District Court in South Carolina"), and then opine whether Ford complied. It is, however, the Court's exclusive role to define the discovery law applicable to this case, and it is likewise the Court's exclusive role to resolve discovery disputes and, pursuant to Fed. R. Civ. P. 37, to address any alleged unethical behavior.

Indeed, Plaintiffs in this case have filed various discovery and sanctions motions based on the very conduct that they now seek to present to the jury through Professor Freeman. While

the Court has in some instances directed Ford to respond to discovery requests, it has also denied in part plaintiffs' motions, and it has not found any sanctionable conduct. Dissatisfied, plaintiffs now seek to have Professor Freeman assume the Court's role and declare to the jury that Ford and its lawyers are bad actors. This is not his role to assume, and any such testimony should be excluded.

### C.  Professor Freeman's Proposed Testimony Is Inadmissible Personal Opinion That Will Not Aid The Jury

The subject of an expert's testimony must be "scientific . . . knowledge". *Daubert*, 509 U.S. at 590. "Scientific" implies a grounding in the methods and procedures of science; and "knowledge" connotes more than subjective belief or unsupported speculation. *Id.* In order to qualify as "scientific knowledge" an inference or assertion must be derived by scientific method and the proposed testimony must be supported by appropriate validation. *Id.* The requirement of knowledge is to guard against the admission of subjective or speculative opinions. *In re Rezulin*, 309 F.Supp.2d at 531.

*In re Rezulin* is particularly instructive on the issues presented by Professor Freeman's proposed testimony. In that case, also a product liability action, plaintiffs proffered expert testimony concerning a drug company's alleged unethical conduct in the suppression of research and the manner in which it conducted clinical trials. *Id.* at 539. The drug company successfully moved to exclude the expert testimony on the grounds it consisted of nothing more than the witnesses' personal, subjective opinions. *Id.* at 543. As the court explained, even assuming that expert testimony on the ordinary practices of a profession or trade may be appropriate to enable the jury to evaluate the conduct of the parties, the testimony must still comport with the reliability and helpfulness requirements of Rule 702. *Id.* Where opinions regarding ethical obligations are, at their core, simply that sponsors of clinical research should be honest, such

testimony is "so vague as to be unhelpful to a fact-finder." *Id.* Professor Freeman's proposed testimony here is, at its core, that Ford and its lawyers had an obligation to be honest and forthcoming, and his testimony is likewise of no help to the jury.

Similarly, as with the witnesses in *In re Rezulin* who accused the defendant Warner-Lambert Company of unethical conduct, Professor Freeman's proposed testimony that Ford acted unethically in discovery is nothing more than his personal and subjective opinion, unsupported by any systemic inquiry, and thus is inadmissible. While Professor Freeman spent days discussing this case with plaintiffs' counsel and absorbing their vitriol against Ford, he has not spoken with any current or former Ford employees. (Dep. Trans. p. 51). While he is critical of Ford's discovery conduct in producing documents, he has no direct knowledge about how the documents were collected and produced by Ford's counsel. (Dep. Trans. p. 55, 128). While he is critical of Mr. Wheelock's testimony about the role of the Critical Concerns Review Group ("CCRG") in the door latch investigation, Professor Freeman does not have any personal knowledge about the operation of the CCRG. (Dep. Trans. p. 55). Indeed, while he seeks to divine the reasons for Joel Smith's withdrawal from representing Ford, he has not spoken to Mr. Smith about it, and admittedly lacks any direct information about the circumstances leading to Mr. Smith's withdrawal. (Dep. Trans. p. 152).

Indeed, Mr. Freeman concedes that he did not follow any established methodology in forming his opinions, and that his opinions are based on his personal views and experience.

> Q    In reaching your opinions, I can guess, but I'm not going to guess, tell me what methodology you used to reach those opinions.
>
> A    The legal profession doesn't have any kind of mechanical yardstick for determining when something is okay or not okay. From

> an ethics standpoint, we have certain
> standards . . . And the – it's a combination
> of what I've seen, what I know concerning
> the applicable standards concerning what
> makes sense or what doesn't make sense,
> what's plausible and what's not plausible.
> It's led me down the road to the opinions
> that I hold. (Dep. Trans. p. 81-82).

> A      . . . I don't believe you have a half-billion
>        dollar recall even being contemplated
>        without a bunch of people – substantial
>        people in the company knowing about it.
>        And Mr. Wheelock was that, and I believe
>        that his answer fits the evasion, the falsity
>        theme of the treatment of this particular
>        defect or alleged defect. (Dep. Trans. p. 90,
>        l. 9-15).

Indeed, much of Professor Freeman's testimony is based on nothing more than information gleaned solely from conversations with plaintiffs' counsel. For example, Professor Freeman contends that Ford makes use of confidentiality orders when settling cases as a means to conceal those cases from future discovery. At his deposition, Professor Freeman cited two examples, *Bringhurst v. Ford* and *Medina v. Ford*. He had not, however, seen the Confidentiality Orders entered in those cases, and was basing his opinion solely on the representations of Mr. Bell.

> Q      But you have an opinion based on an
>        agreement that you haven't seen?

> A      I have an opinion based on Mr. Bell's
>        contact with the lawyer and his terror at
>        doing anything that could jeopardize him.
>        (Dep. Trans. p. 104).

Similarly, his opinion that Ford lawyers and employees concealed documents is based solely on statement from plaintiffs' counsel, not a personal investigation of what actually transpired.

A     ...I was told when Salmon [a Ford employee] left, he gave the documents to Adair, Bowen-Adair. That may not be true, but that was what I understood. It's what I testified to and its what he [Mr. Bell] just said.

Q     And your source of information from that was Mr. Bell?

A     That's right. (Dep. Trans. p. 113-114)

. . .

A     . . . Now, what I understand, based on counsel, is a forward sweep for documents is a term of special significance to Ford that doing a document sweep has special meaning.

Q     What's the basis of that understanding?

A     Counsel telling me that when they do a sweep – you remember –

Q     Counsel, Mr. Bell?

A     Yeah, Mr. Bell. . . (Dep. Trans. p. 126-127).

However distinguished and able Professor Freeman may be as a law professor, his proposed testimony is not insulated from scrutiny under Rule 702. Professor Freeman's testimony is speculative, subjective, and is not based on any recognized methodology. It is nothing more than his personal opinion, derived largely from the one-sided representations of plaintiffs' counsel in hours of conversation, and has no place before a jury.

The trial judge in *In re Rezulin* started his opinion with a useful history lesson about the use of "compurgators" or "oath helpers" in jury trials of old.

Among the antecedents of our modern jury trial was wager of law, or compurgation, a form of trial by ordeal. The

accused found a number of people and then took a solemn oath that he or she was innocent. The companions, or "compurgators" as they were called, then swore that the oath which he [or she] had taken was clean. . . . They d[id] not swear to the facts of the case, but merely to their judgment that the accused is a credible person.

A practice reminiscent of wager of law has become fashionable among some well-financed litigants - the engagement of "expert" witnesses whose intended role is more to argue the client's cause from the witness stand than to bring to the fact finder specialized knowledge or expertise that would be helpful in resolving the issues of fact presented by the lawsuit. These "experts" thus are loosely analogous to compurgators, also known as oath helpers, in that they lend their credentials and reputations to the party who calls them without bringing much if any relevant knowledge to bear on the facts actually at issue.

309 F.Supp.2d at 538 (footnote omitted).

Professor Freeman is a compurgator. He has added his voice to the chorus of plaintiffs' counsel accusing Ford of misdeeds, but he brings no relevant knowledge or expertise to bear on the facts at issue in this action. He should not be permitted to testify.

## IV. CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court exclude the proposed testimony of Professor Freeman.

FORD MOTOR COMPANY

December _____, 2004

By Counsel

Fed ID #4657

John S. Wilkerson, III
J. Rene Josey
TURNER, PADGET, GRAHAM & LANEY, P.A.
Post Office Box 22129
Charleston, South 29413
(843) 576-2801

Rosewell Page, III
J. Tracy Walker, IV
McGUIREWOODS, LLP
One James Center
901 East Cary Street
Richmond, Virginia
(804) 775-1000

   Counsel for the Defendants

## CERTIFICATE OF SERVICE

I hereby certify that a true and accurate copy of the foregoing Memorandum was mailed, postage prepaid to the following counsel of record:

> J. Edward Bell, III
> J. EDWARD BELL, III, LL.C.
> 232 King Street
> Post Office Box 2590
> Georgetown, South Carolina  29442

and hand-delivered to the following counsel of record:

> Joseph F. Rice
> Rhett D. Klok
> Frederick J. Jekel
> Kevin R. Dean
> MOTLEY & RICE, LLC
> 28 Bridgeside Boulevard
> Post Office Box 1792
> Mount Pleasant, South Carolina

this 3rd day of January, 2005.

_Diane A. Bolton_
Diane A. Bolton

```
 1              UNITED STATES DISTRICT COURT
                DISTRICT OF SOUTH CAROLINA
 2                   FLORENCE DIVISION

 3
      ZACHARY STRICKLAND, JERRY I.
 4    STRICKLAND, and MARSHA B.
      STRICKLAND,
 5

 6              Plaintiffs,

 7    vs.             CIVIL ACTION CASE NO. 4:00-1391-23

 8    FORD MOTOR COMPANY and
      FAIR BLUFF MOTORS, INC.,
 9
                Defendants.
10

11    DEPOSITION OF:   JOHN FREEMAN

      DATE:            June 30, 2004
12

      TIME:            9:08 a.m. - 1:54 p.m.
13

      LOCATION:        Offices of
14                     TURNER, PADGET, GRAHAM & LANEY, P.A.
                       1901 Main Street
15                     Columbia, SC

16    TAKEN BY:        Counsel for the Defendants

17    REPORTED BY:     MAUREEN A. VISCUSO, RMR, CRR
                       Registered Professional Reporter
18

19    ───────────────────────────────────────────────

20    Computer-Aided Transcription By:

21        A. WILLIAM ROBERTS, JR., & ASSOCIATES

22    Charleston, SC                   Greenville, SC
      (843) 722-8414                   (864) 234-7030

23    Columbia, SC                     Charlotte, NC
      (803) 731-5224                   (704) 573-3919
24

25
```

2

```
 1    APPEARANCES OF COUNSEL:
```

ATTACHMENT
A

16    These things don't have anything to do with your
17    lawsuit. Go away. Forget about it. These on-side
18    openings were not and, of course, could not be
19    related to any inertial effect. You've been given
20    complete discovery on the subject. It's not to the
21    best of my knowledge or I am informed that lawyer to
22    lawyer, you know, you don't have anything. Go away.
23    You're wasting my time. You're wasting my client's
24    money.
25              Now, this is followed by

☐

1    Mr. Wheelock's affidavit. Mr. Wheelock's affidavit
2    April 11th, 2003 is almost verbatim. In fact, if
3    you look at Wheelock's affidavit, there's a line
4    that's cut off here. On every copy of the
5    March 27th letter that I have, there's a line that's
6    cut off at the end of the first page. Wheelock's
7    affidavit has got the line in there. And so
8    Wheelock puts in an affidavit essentially
9    lockstepping this letter saying go away, you've got
10   nothing. There's nothing there. These
11   investigations don't have anything to do with F150
12   trucks like you've got. They don't have anything to
13   do with your case. You're wasting our time. You
14   don't have anything.
15              Now, we know later, and this is why
16   it's famous to me, that Joel writes actually two
17   letters. One, and then he corrected the typo and
18   the other one. I call these noisy notice of
                    Page 35

19    withdrawal letters, though he did not withdraw at
20    this time, but he's laying the groundwork for a
21    withdrawal.  As you know, under 1.6, essentially,
22    you are not to divulge freely information given to
23    you by your client.  One of the rare instances when
24    you can disclose information is where you believe
25    that your client has engaged in improper acts and

☐

1     has involved you in the improper acts.
2              And what you are allowed to do then
3     under the comments of Rule 1.16 is what's called a
4     noisy notice of withdrawal disavowing documents,
5     withdrawing things, basically, alerting the other
6     side there are grave problems with this.  And that's
7     what he did on November 21, 2003, in my estimation,
8     which he then followed with his withdrawal from the
9     case on November 26.  So -- and what's interesting
10    is though you've got the withdrawal of Wheelock's
11    affidavit and the withdrawal of his letter pending,
12    quote, Ford examining these documents, the 6J08
13    documents, to determine their effect, if any, upon
14    the facts set out in the affidavit and the letter,
15    you still have a brief come in which has never been
16    withdrawn by Ford making it, basically, the same
17    arguments as in Wheelock as in Joel's letter.
18         Q.    That being this brief, Defendant's 19?
19         A.    Yeah.  Among other things, quote,
20    plaintiffs are continuing their tactics of delay
21    which they have employed since this case was filed

22    because they have no evidence of a defect involving

23    any component of the Strickland truck.  That's on

24    page 10 of the memo, the memo that's dated March 21.

25    "Defendants believe plaintiffs are engaging in

□

1     nothing more than delay tactics to try to continue

2     harassing Ford with more irrelevant discovery

3     requests and prevent this case from proceeding on a

4     trial on the merits."  And there's a document

5     dated --

6         Q.    Defendant's 19 actually was created

7     before the Joel Smith letters you just read?

8         A.    Yeah.  That kind of mocks the

9     plaintiffs.  But there's a 4/16, April 16, brief.

10    That's the one I'm referring to.

11        Q.    And you're using your chronology that

12    we identified earlier?

13        A.    Yeah.  And as far as I know, that

14    brief has never been withdrawn.  The brief claims

15    that the door latch system is fine.

16        Q.    Have you been made aware in your work

17    that Mr. Smith -- Joel Smith represented to the

18    court that his withdrawal was over financial reasons

19    and not ethical reasons?

20        A.    I saw that in John Wilkerson's

21    colloquies with Judge Kosko, that, essentially, has

22    nothing to do with anything ethical, but I'm not

23    here as a business manager.  I'm here as an ethics

24    expert, and I know what's going on when people tell

1 you know, if his euphemism for grave

2 disappointment -- lawyers don't like to accuse their

3 clients of anything. I think he's done a pretty

4 good job of handling this from his standpoint in

5 a way least injurious to Ford. If he wants to call

6 it a business decision that he made, God bless him.

7     Q.    If he said to the court in Strickland

8 that his withdrawal was strictly over financial

9 arrangements with Ford, that would not change your

10 opinion or be important to you at all?

11     A.    You know, it would be a piece of

12 evidence that I'd take into account. I'm telling

13 you what a withdrawal of a letter and withdrawal of

14 an affidavit, which is extremely unrare to see --

15 extremely unusual to see, tells me is going on and

16 that's my view. That's what I hold.

17     Q.    That's an opinion you've reached from

18 those circumstances?

19     A.    From all that I've read to this point.

20 But, you know, there's more to it than that.

21 Mr. Wheelock's deposition -- in his deposition, the

22 same guy who gets his affidavit withdrawn and,

23 apparently, was the source of information for Joel

24 in Joel's March 27 letter, good old Mr. Wheelock,

25 CCRG chair for 11 and a half years, as far as I can

 

1 tell, perjured himself in his deposition because he

2    was asked if CCRG is familiar with door latch

3    casings, he says no.

4                    In fact -- and what's so annoying

5    about this to me, frankly -- this is on 8/29/01.

6    Wheelock is deposed.  Mister CCRG chair asked if

7    he's familiar, quote, at all with allegations of

8    door latch problems.  And he says, Well, you know

9    there's all kind of issues that we have at CCRG.

10   Then he's asked if he is familiar specifically with

11   door latch claims.  Answer, I am not.  That's

12   deposition page 25, and yet who puts in the

13   affidavit on CCRG door latch claims, you know, two

14   years later?  Mr. Wheelock, Mr. Wheelock whose

15   affidavit then gets withdrawn.

16           Q.    Do you know what materials he had

17   available to him at the time of his deposition?

18           A.    He had all the CCRG files on 6J01,

19   6J08, and he darn well knew that there were door

20   latch problems with the Ford Explorer -- or Ford

21   pickups, Ford F150 pickups.  There's no question

22   about that.

23           Q.    When you say he knew, you're again

24   relying on the fact that he had a previous

25   involvement and a record, if you will, or presumably

☐

1    a record as chair of the CCRG?

2           A.    Right.  And the door latch issue had

3    percolated to the level where we now know that there

4    was a -- from the evidence at least, temporarily a

5   recall number assigned and a price calculation in
6   the hundreds of millions tied into that recall.
7   Now, we're not talking about a missing trash can at
8   the headquarters or paper clips that have been
9   misplaced.  We're talking about
10  a-half-a-billion-dollar problem concerning F150
11  related PN96 door latches, which CCRG has
12  investigated under his lead and, at one point, made
13  a decision that it's a half-a-billion-dollar
14  problem.
15          We're talking about a problem that is
16  of such magnitude that when it comes out that this
17  has happened, you have a page 1 story on the Detroit
18  Newspaper, and the Detroit Newspaper is familiar
19  with the automobile business.  This is not some
20  minor molehill of a hypothetical, possible somebody
21  might say maybe there's a problem.  This is a huge
22  problem.  And the question is asked about this huge
23  problem of maybe the man within Ford who is most
24  knowledgeable about the ins and the outs of the
25  problem, and he says he doesn't know about it.  And

0

1   I think it's perjury.  And I also think Mr. Ayub was
2   guilty of perjury with his line about not knowing
3   about crash tests, which he got called on at his
4   deposition in this case.
5           So believe me, you know, if I'm Joel
6   Smith and I'm seeing, you know, some of my key
7   witnesses saying things that don't seem to be the

8   truth, and I've been relying upon those people, I
9   may have good business reasons, but I'll tell you
10  what, I can call it financial because there's no
11  amount of money that is going to get me to stay in
12  this case. They can't pay me enough money to get me
13  to stay in the case if that's the way they want to
14  conduct themselves and potentially hang me out to
15  dry. So maybe it's fair to call it a financial
16  business issue, because in that light, no amount of
17  money would be sufficient.

18          Q.    All right. Has plaintiffs' counsel
19  advised you that Mr. Smith said there were no
20  ethical issues and made that representation to the
21  court?

22          A.    If he made that representation, then
23  shame on him, because there are ethical issues up
24  and down including perjurious testimony, including
25  perjurious affidavits, including false

☐

1   representations by counsel, and there's, obviously,
2   a huge ethical problem in house at Ford. And to say
3   that there's no ethical issues is more than trying
4   to put a pretty face on a bad situation. It is
5   misleading the court.

6           Q.    We'll get back into all that. We kind
7   of got into your opinions while we're reviewing the
8   documents you have there. Most of that was
9   triggered, I guess, by Defendant's 21.

10          A.    You asked me why it was famous or

20   certainty, we should go through categories of

21   witnesses.

22          Have you communicated with the

23   Strickland family?

24      A.   Have not.

25      Q.   Have you communicated with any of the

51

1   engineering experts?

2      A.   No.

3      Q.   Have you communicated with any Ford

4   employees or former Ford employees?

5      A.   No.

6      Q.   Have you communicated with anyone

7   other than Mr. Bell and maybe Kendall Few, Mr. Dean?

8      A.   And Jeckel.

9      Q.   Jeckel?

10      A.   And Kim Pring, and, of course, office

11   staff at Mr. Bell's office.

12      Q.   That's the universe of persons that

13   you've consulted in forming any opinions you have in

14   this case?

15      A.   People I've talked to, that's true.

16      Q.   I asked you earlier about an

17   engagement letter, and I believe you said there was

18   no engagement letter for this -- your work in

19   Strickland; is that correct?

20      A.   Right.

21      Q.   How are you being compensated for your

22   work in Strickland?

23          A.      Hourly.

24          Q.      And how much are you being paid per

25     hour?

1          A.      350 an hour.

2          Q.      And you told me you had done some work

3     with Mrs. Jeckel before?

4          A.      Right.

5          Q.      Have you done any work with Mr. Bell's

6     firm before?

7          A.      I don't believe so.  Well, many years

8     ago when he was in Sumter and much younger, there

9     was something that I helped him and some other

10    lawyers on, but in the last say 15 or 20 years,

11    nothing.

12         Q.      What percentage of your time is

13    spent -- your occupational time, your

14    non-recreational time is spent doing expert witness

15    work or analysis?

16         A.      It varies.  I would say in the last

17    year, maybe 10 percent.  Not very much.

18         Q.      And what percentage of your income is

19    derived from those activities say in the last year?

20         A.      I wouldn't say more than 10 percent.

21         Q.      You've given me a list of cases.

22         A.      Right.

23         Q.      I believe that list of cases is just

24    cases in which you've testified?

25         A.      True.  Yeah, at a deposition or in

1    majority plaintiff's side.

2                    MR. BELL:  Keep going.  This is the

3    call I've been waiting on.  Keep going.  No problem.

4                    (Mr. Bell exited the deposition

5                    room.)

6    BY MR. JOSEY:

7        Q.    Would you rather I wait?

8        A.    No.  No, I want to --

9        Q.    Do you have a deadline?

10       A.    I don't.  I don't want to waste your

11   time.

12       Q.    Can you give me the names of cases, as

13   many as you can, and the jurisdictions in which your

14   testimony has been excluded to your knowledge?

15       A.    There's a case involving -- it was

16   Q tam case involving Westinghouse, and that was

17   Judge Currie, and I think that's the only case.

18   There's --

19       Q.    Dawkins v. Fields?

20       A.    There's Dawkins v. Fields.  They

21   rejected an affidavit, and there's a case involving

22   corporate blowout in Aiken where Judge Peeples did

23   not let me testify.

24       Q.    Name the case.

25       A.    Don't know.  I was working for Nelson

1    Mullins at the time.

2        Q.    Do you remember who at Nelson Mullins?

3        A.    Yes.  Clarence Davis.

4      Q.    And maybe I should broaden my question
5    to excluding your testimony and/or affidavits.  What
6    additional --
7      A.    I don't know of any.
8      Q.    Do you have any personal knowledge,
9    outside of what you've gleaned from the documents
10   we've identified here today, of how documents are
11   created at Ford Motor Company?
12     A.    No.
13     Q.    Do you have any personal knowledge,
14   outside of the documents you've identified today, of
15   how the CCRG works within Ford Motor Company?
16     A.    No.
17     Q.    Do you have any personal --
18     A.    Well, other than, you know, talking to
19   counsel and CCRG as an acronym that is used in
20   conversations because we got CCRG studies that are
21   involved in this case, and I've talked about it with
22   counsel, but I don't have any Ford documents aside
23   from the documents that I've produced here today.
24     Q.    Right.  And my question was just do
25   you have any personal knowledge of how the CCRG

56

1    works outside of what you've identified here?
2      A.    Not outside of what's reflected in the
3    documents.
4      Q.    And to the extent counsel has given
5    you information about how it works, have you relied
6    on that in reaching any of your opinions?

2   as to connotating a jury pool and excessive improper

3   behavior either by defense lawyers, plaintiff's

4   lawyers, prosecutors, but it's not something I have

5   an opinion about here today.

6        Q.   One way or the other?

7        A.   I just don't have any opinion about

8   it.  It's not something I've considered.

9        Q.   Another one of your answers indicated

10   that the data you reviewed included all of this,

11   included the newspaper article, and in preparing for

12   today, you also have had conferences with counsel.

13        A.   True.

14        Q.   How many conferences have you had with

15   counsel?

16        A.   Let me break it down.  I met with

17   Mr. Jeckel in Charleston.  I met with Mr. Bell here

18   twice.  I've had numerous phone conversations with

19   Messrs Jeckel, Bell and Kevin Dean, and I also

20   mentioned earlier Kim Pring.  She's not a lawyer,

21   but she's been involved in this.

22        Q.   She's an assistant in Mr. Bell's

23   office?

24        A.   She is.  She's a paralegal and kind of

25   the document honcho.

 

1        Q.   You told me earlier you were billing

2   by the hour.  Have you itemized or totalled out your

3   hours from all these conferences you've just

4   described?

5      A.    I haven't totalled them out.  I would
6   estimate in the area of 45, 50 hours as I arrived
7   here today.
8      Q.    And do you keep time sheets like us
9   unfortunate lawyers sometimes?
10      A.    No.  I'm going to have to go back and
11   reconstruct my time.  That's just a ballpark in this
12   matter.
13      Q.    Have you submitted a bill to date in
14   this matter?
15      A.    Have not.
16      Q.    Continuing with the disclosure.  This
17   indicates you may testify about Ford's conduct in
18   responding to the discovery requests and court
19   orders concerning discovery.  And then it specifies
20   that you may have an opinion on the propriety of
21   Ford's action or inaction relating to the -- it says
22   Hayward, but we believe it should be Strickland --
23   litigation and discovery.  Tell me what opinions or
24   areas you have and that you anticipate testifying
25   about.

1      A.    I think Ford's been guilty of
2   discovery abuse -- serious discovery abuse in this
3   case concerning the door handle, the document
4   disclosure and concerning efforts to place evidence
5   out of the reach of plaintiff's counsel.  That's a
6   headline.
7      Q.    Are there subtitles to that headline?

8       A.      Various manifestations of what I

9   consider to be improper behavior.  I mentioned

10   perjury.  Mr. Ayub has lied, has admitted he lied.

11   Giving deflecting attention from crash tests, which

12   are important pieces of evidence for lawyers and

13   cases of this sort.  That's inexcusable.  I know of

14   no explanation other than the guy is happy to engage

15   in criminal activity.

16       Q.      When you say he admitted he lied, are

17   you referring to the transcript you read earlier

18   where he admitted he was incorrect in an earlier

19   deposition?

20       A.      Yep.  Exactly.  Mr. Wheelock I believe

21   lied in his deposition and he presented a false

22   affidavit to the court, and I, also, fault him for

23   supplying false and fraudulent information to

24   Mr. Smith for Mr. Smith's reliance in the March 27

25   letter and as counsel for Ford.  I fault Ford

1   in-house lawyers for having either non-existent or

2   miserably inadequate controls over documents

3   concerning door handle defects or alleged defects.

4            I think it is astounding and just

5   outrageous that massive amounts of documents

6   concerning a planned half-a-billion-dollar

7   investment in fixing a problem -- though I'm aware

8   that Ford later denied that there -- and still

9   denies that there was ever any problem at all.  That

10   these documents which are clearly relevant, which

11      any first-year law student would understand to be

12      clearly relevant to a F150 PN96 door opening case

13      were hidden for years by Ford, and by hidden, I want

14      to be explicit.  Ford originally produced a CDR --

15      CD not read/write but --

16              Q.      CD rom?

17              A.      CD rom disk in a non-searchable way,

18      basically, pictures of documents which is for

19      whatever reason there was search software available

20      that was not supplied to counsel.  The

21      representation was this is the door handle

22      collection, this is what we got.  I don't believe

23      Kimberly Bowden-Adair and other similarly

24      knowledgeable people at Ford could possibly have

25      believed that to be true because they had to know

☐

69

1       about the PN96 problem.  They had to know about the

2       6J08 problem, 6J01.  They had to know that these

3       documents existed.  They had to know about the

4       settlement documents.  I believe they had the

5       settlement documents, and instead, they hid those

6       documents.

7               It is astounding and beyond belief to

8       me that when the CDR is reviewed, that there are no

9       6J08 documents on there.  That the only way that the

10      documents were found was by Kevin Dean going in June

11      I believe of '02 and insisting that he be allowed to

12      look at paper records and finding six boxes of paper

13      records of the supposed door handle collection that

14    were not on the CD rom, which he and counsel had

15    been told by Ford -- by Ford's counsel was a

16    complete collection.

17              And in those boxes he found two

18    different documents referencing 6J08 and then things

19    started to take form.  But even from that point on

20    into the spring of 2003, you had Ford denying and

21    misleading saying, essentially, that those

22    investigations have nothing to do with this case,

23    have nothing to do with the F150 in the Strickland

24    case.  Counsel's wasting their time.  Counsel's

25    misleading the court.  Counsel's harassing and being

1     abusive.

2               And it's all degrading, blaming,

3     attacking personally opposing counsel when the

4     reality is that there's a massive amount of

5     documents that, to the knowledge of the Dearborn

6     people, haven't been produced and aren't being

7     produced.  And then it's only when evidently Nelson

8     Mullins sends some lawyers to Dearborn that things

9     change in the August/September time frame.  An order

10    is issued incorporating the June -- the

11    September 3rd letter, the orders issued on September

12    4th.

13              Then we start to have these documents

14    being produced in volume.  Then we have Mr. Joel

15    Smith exit and withdraw reliance on his letter and

16    withdraw the affidavit, and to me that is a shocking

17    development.  I know that there -- he makes, from
18    what you say, an explanation to the court that
19    everything's fine and all this --
20         Q.    You don't have to take my word for it.
21    Just asking have you been told that?
22         A.    And that's -- in the annals, and I've
23    been dealing with ethics here in South Carolina for
24    30 years, that is a remarkable shocking event in a
25    case like this, in a firm like that, withdraws

1     reliance on a letter that it wrote -- a detailed
2     letter that it wrote concerning discovery and
3     withdraws a leading corporate official's affidavit,
4     that is un-- unknown to happen.  That is just
5     shocking, rare occurrence in South Carolina.  It may
6     have happened in other cases.  I just haven't heard
7     about it, and I hear about cases all the time.
8              So then we come around the bend and we
9     know that when he wrote the letter in March, in
10    April, in that time period, he had more attacks on
11    the plaintiffs' lawyer, you know, no more discovery,
12    frivolous door handle accusations.  They don't have
13    anything.  One view is trying to keep the lid on,
14    trying to foreclose any inquiry, but even today in
15    the last two weeks, we've gotten Logel's
16    interrogatory answers and Kimberly Bowden-Adair's
17    interrogatory answers.  And as a lawyer and as a law
18    professor in the ethics area, I sit here and say
19    does Ford really get it.

20          You've -- those orders -- those

21     interrogatories, as I understand, were sent out

22     under court order -- or with -- pursuant to court

23     permission, and what I find in there is evasion.  I

24     find not answering discovery requests by those

25     people.  Then I find them not even signing their own

1     answers to the interrogatories that are posed to

2     them, but some stamp by Mr. Smith signing that.  And

3     so you're going to have a, you know, meet and

4     confer, motion to compel.

5          And what does it take before Ford

6     decides to just play straight?  Maybe it takes a

7     default judgment.  Maybe it takes a massive fine.

8     I'd like to think that the company had seen the

9     light having been essentially stalked by these

10    plaintiffs' lawyers all the time blaming them you're

11    dilatory, you're harassing, oh this, and then

12    finally coughing up this bonanza of documents with

13    this breathtaking news that they're claiming a

14    defect about something that actually Ford engineers

15    thought at one point was defective, and the Ammerman

16    case.

17          In Ammerman, Ford is coming in after

18    losing claiming that they should have been allowed

19    to talk about crash tests, because if they had been

20    allowed to talk about that evidence, they could have

21    undercut the credibility of the plaintiffs' expert.

22    Well, what would -- Ford says, you know, it's

23      admissible. we could have used it.  I could have

24      turned the tide for us.  Well, what on earth do you

25      think plaintiff's lawyers in a defect case might be

1       able to do with documents from Ford engineers saying

2       golly, we think there's a defect here with these

3       door handles?  We think we ought to spend, you know,

4       half a billion dollars and fix it, put -- you can

5       say well, oh that was false or they were just, you

6       know, mistaken, but that's something that is a piece

7       of relevant evidence that maybe the jury ought to

8       hear about.

9                     Who on earth inside of Ford could

10      think those documents were not relevant?  And I'm

11      going to answer my own question.  They knew they

12      were relevant.  They just did not want to see -- let

13      them see the light of day.  And there's more.  I

14      want to say more, and then I'll shut up.  Let me

15      finish.

16              Q.    I want you to finish --

17              A.    Because you asked me what I thought

18      about Ford.  Now I'm going to finish with this.

19      Bringhurst and Medina, Mr. Bell tells me he tried to

20      get the lawyer for the plaintiff in Bringhurst to

21      talk to him.  That lawyer told him that the file in

22      Bringhurst is sealed so tight that not even God can

23      unseal it, that he will not divulge anything about

24      his case for fear of punishment by Ford, okay.

25                    I think that that boarders on

                        Page 66

1     obstruction of justice, and here's why. You've got
2     a witness in -- you've got evidence out there, not
3     just a witness, but a victim who is supposedly
4     barred for life from ever divulging that evidence to
5     somebody else who might be able to use that in the
6     courtroom. Read my article on "Cover Up of
7     wrongdoing." And I think those are -- agreements
8     are fraudulent. I think that they're obstruction of
9     justice. I think they're illegal. There may be a
10    compounding issue as to entering into those
11    agreements, and that is criminal.
12                    I think Ford, to the extent that it
13    tries to buy secrecy in order to hide evidence in
14    related cases, is engaging in improper acts, and
15    I've got some authority which I cite in here for
16    that proposition. And I don't distinguish, Rene,
17    between Ford taking all the documents and all the
18    evidence relevant to the Bringhurst case, which I
19    have reason to believe is relevant -- it's referred
20    to in these documents -- and taking it out and
21    burning it or burying it or otherwise destroying it.
22    I don't distinguish between that and Ford going and
23    buying silence to put those documents beyond
24    investigation by other victims. I think it's
25    reprehensible. I think that there are potentially

```
 4    document, stamp it, you know, attorney/client

 5    privilege, now we're making it privileged.  The sign

 6    is that that's what was going on at Ford and may

 7    still be going on.

 8         Q.    Do you have any personal knowledge of

 9    how those documents were created at Ford?

10         A.    Only this:  That if Salmon wasn't

11    creating the report on the 12 different crash tests

12    as part of a legal advice colloquy with general

13    counsel's office but was instead doing it for

14    technical business reasons, then it was not

15    privileged.

16         Q.    Again, my question is do you know

17    how --

18         A.    I'm trying to answer the question.  We

19    know that it created the document, okay.  Part of

20    the document at the top, the legend is the privilege

21    claim is at the request of legal counsel, so we know

22    that legal counsel requested that he label the thing

23    as priveledged, okay.  Here's what I want to know --

24         Q.    Wouldn't that be sound advice if

25    counsel asked him to create the document as part of
```

⬚

```
 1    a colloquy with counsel?

 2         A.    Then that would be fine, and we know

 3    that good lawyers are prone to label things

 4    privileged that are privileged.  Here's my question:

 5    If this is privileged, why is it being produced?

 6    Because if it's privileged and it's being produced,
```

7    then I'll turn to Mr. Bell and tell him that they
8    have waived the privilege as to the entire subject
9    matter of all their crash tests and all the defect
10   problems that they have with PN96, and they are not
11   entitled to claim privilege as to any of those
12   documents because, as you know, Mr. Josey, once you
13   waive privilege as to part of a collection of
14   privileged documents concerning that subject matter,
15   it's waived as to all of them.
16        So there's one of two things going on
17   with the Salmon document, it either is privileged
18   and has been produced in which case it's a waiver of
19   everything concerning crash tests of PN96 defects,
20   and that means start printing out for Mr. Bell and
21   everyone else around the country all these allegedly
22   privileged documents, or it was never privileged to
23   begin with, in which case, that plays into my
24   position of improper behavior, improper cloaking of
25   unprivileged documents with the privilege claim to

⬚

1    defeat plaintiff's investigations.  It goes one way
2    that hurts Ford or another that hurts Ford.  There's
3    no middle ground there that I see.  That's an
4    opinion I hold.
5        Q.    I understand.  My question was:  You
6    don't have any personal knowledge of the
7    circumstances of how that document was created?
8        A.    Only that somebody told the author,
9    evidently Mr. Salmon, to put on it --

10          Q.      How do you know he didn't just do that

11    on his own?

12          A.      It says at the request of legal

13    counsel. He's not legal counsel. Somebody within

14    the legal staff told him to cloak -- try to get that

15    thing cloaked with a privilege. And my point is

16    simply this: Either it is a valid privileged

17    document, in which case Ford had no business

18    producing it and has waived the privilege by doing

19    that as to that entire subject matter, or it was

20    never privileged, in which case, that lawyer who

21    claimed privilege on it was perpetrating a wrong on

22    people like Mr. Bell.

23          Q.      And ultimately, the decision of

24    whether something is privileged or not within the

25    context of the Strickland case is not yours to make

☐

1     but the court's; is it not?

2           A.      Well, there are other people who make

3     that decision. Ford makes its own independent

4     decision whether it's privileged. The court may

5     agree or disagree. Ultimately, the final arbiter of

6     that may be the US Supreme Court, for all we know.

7     It will be a judicial officer at some point. But in

8     this case, there's no way that a court's going to

9     find that the thing is privileged because it's been

10    produced. How could it possibly be privileged when

11    Ford's released it --

12          Q.      Well, at the time the privileged log
                           Page 71

16    investigating a case as the fine people around the
17    country who have got similar cases and connect with
18    them and then compare notes.  That's why we had
19    Mr. Bell at counsel's table in Guzman.  They finally
20    linked up.
21              But for a long time they were kept
22    where neither knew that the other existed.  And
23    certainly the Guzman documents like the complaint in
24    Guzman is a document, unprivileged documents, public
25    document that Ford has and knows about is relevant

☐

81

1     to this case is not produced.  That's pretty much
2     the essence of what I have to say.  Before we go
3     further, I'd like to take another break.
4              Q.    Okay.
5                    (A recess transpired.)
6    BY MR. JOSEY:
7              Q.    In reaching your opinions, I can
8     guess, but I'm not going to guess, tell me what
9     methodology you used to reach those opinions.
10             A.    The legal profession doesn't have any
11    kind of mechanical yardstick for determining when
12    something is okay or not okay.  From an ethics
13    standpoint, we have certain standards.  I have a lot
14    of experience, knowledge, background, training,
15    experience.  I've been involved in some litigation.
16    I've taken some depositions.  I've studied cases
17    where you have issues of perjury.  Studied issues
18    concerning discovery abuse.
                    Page 73

19          Have written about discovery abuse.
20   Taught about discovery abuse to lawyers and law
21   students. I've testified. And the -- it's a
22   combination of what I've seen, what I know
23   concerning the applicable standards concerning what
24   makes sense or what doesn't make sense, what's
25   plausible and what's not plausible. It's led me

1    down the road to the opinions that I hold.
2          Q.    And your initial comment that there is
3    no mechanical methodology or yardstick in the legal
4    profession would mean that your opinions are not
5    subject to being mechanically tested?
6          A.    They're subject to being refuted by
7    say another expert. You don't have any gizmo for
8    sale for 29.95 or the secret decoder ring that you
9    can point at something and say that thing just lit
10   up, that's discovery abuse. But for example, there
11   are articles that are written about discovery abuse,
12   what it is, what the dimensions are, what the
13   manifestations are. Lawyers are taught about
14   discovery abuse.
15          We just finished last Friday, I was
16   given a CLE with Justice Pleicones swearing in
17   people on our new oath of office that requires
18   honesty, trustworthiness, civility and discovery --
19   I was talking about discovery abuse there because
20   it's a manifestation of incivility among lawyers,
21   and now it's subject to discipline in this state.

22    So in terms of the propriety of behavior by lawyers

23    in their conduct of litigation, that is something

24    that is, you know, fit -- subject for experts.

25    There isn't any one yardstick that you use, but

1     there are principles that you use, and I think

2     experts would commonly agree upon.

3            Q.    And there's no way to calculate or

4     test the error rate in your opinions on these

5     subjects; is there?

6            A.    You can go -- the only way to do it

7     and test an error rate is to test instances where

8     somebody's testified and been proven wrong.

9            Q.    Proven wrong in what way; different

10    jury conclusion?

11           A.    The position is rejected whether it's

12    by a judge or I guess by a jury.  If you testified

13    20 times that something's legal malpractice and 20

14    times the other side wins, then, you know, I think

15    the fair inference would be that you don't know what

16    you're talking about.

17           Q.    One of your more recent forays into

18    Florence I think you ended up on the losing side;

19    did you not?

20           A.    That was reversed on appeal, and the

21    case was -- has been remanded.  The side that I was

22    testifying for was rejected, and then the decision

23    was overturned on appeal, and the case is back in

24    front of the court.

Page 75

11    could have happened, and it's no big deal.

12         Q.    -- that you would understand a witness

13    forgetting about?

14         A.    Yeah, as opposed to a half billion

15    dollar problem that when it's disclosed, shows up on

16    the front page of the local Detroit newspaper on a

17    Sunday.

18         Q.    But again, you don't know how big a

19    deal that is for firsthand knowledge of the whole

20    context for what CCRG might have dealt with?

21         A.    From the whole context of what they

22    might have dealt with, I can't say that I do know,

23    but my belief is that it's a big issue.  And the

24    reason I say that is because it seems to John

25    Freeman like a half a billion dollars, particularly

☐

1     when you gotta go up to the vice president level or

2     officer level, that that is a big deal and it's not

3     something that, you know, say a test driver rolled a

4     truck and a door came open and he never told anybody

5     about it.  So it happened at Ford and Ford in the

6     sense was responsible.  But, you know, it's just a

7     narrow one-time occurrence.  You could see that

8     getting lost in the shuffle.

9              I don't believe you have a

10    half-billion-dollar recall even being contemplated

11    without a bunch of people -- substantial people in

12    the company knowing about it.  And Mr. Wheelock was

13    that, and I believe that his answer fits the

14    evasion, the falsity theme of the treatment of this

15    particular defect or alleged defect.

16         Q.    All right.  You believe his initial

17    deposition testimony was perjurious?

18         A.    Perjurious, yeah.  Then he puts --

19    then he follows it up with a false affidavit that

20    Ford revokes and -- but hasn't said yea or nay about

21    since the Joel Smith letter was written that I know

22    about.  Mr. Wheelock has got some explaining to do

23    is my view.

24         Q.    And your opinions with regard to

25    Mr. Wheelock are based upon his own deposition, I

1    believe you said page 25?

2         A.    That's right.

3         Q.    Anything else?

4         A.    Well, his affidavit which is bogus

5    which gets withdrawn.

6         Q.    Your conclusion that it's bogus is

7    that just based on the fact that it's withdrawn?

8         A.    No, on the content.

9         Q.    And the content seems bogus to you in

10    light of what?

11         A.    In light of the truth of -- concerning

12    the significance of 6J08 to this case, the fact the

13    finding of a defect of the -- on the F150 vehicles.

14    He and Joel at that time, as I read their

15    presentations, and, again, they're almost exactly in

16    pertinent part verbatim, are saying your hounding us

22    may be concealing today other than Bringhurst and

23    Medina which I fault for concealing.

24          Q.    And with regard to Bringhurst and

25    Medina, you mentioned that settlements had been

1     sealed and that the lawyer that Mr. Bell contacted

2     said that he was scared to talk, otherwise, he'd be

3     punished by Ford.  Typically those orders are

4     enforced by courts, are they not, not by parties?

5          A.    The impression I got was that there

6     may be financial sanctions in the agreement that

7     come down on his head and he is not going to say a

8     word period.  Go away.

9          Q.    Have you seen the agreement?

10         A.    No, but I'd like to, and if Ford wants

11    to show it to me, I'd be happy to -- I would be -- I

12    would love to see that agreement.

13         Q.    But you have an opinion based on an

14    agreement that you haven't seen?

15         A.    I have an opinion based on Mr. Bell's

16    contact with the lawyer and his terror at doing

17    anything that could jeopardize him.

18         Q.    Since you mentioned the Salmon

19    documents and that Mr. Salmon testified you belive

20    that he had produced the documents to -- or given

21    the documents to Kim Bowen-Adair --

22         A.    Somewhere in my discussion --

23         Q.    I was going ask you to refer to your

24    materials and tell me where that is.

Page 94

25          A.    I believe it was from counsel the

1     Salmon -- Salmon's file cabinet of documents, and it
2     may have just been a euphemism or there may be an
3     actual file cabinet that his documents concerning
4     what Adair calls the 2000 F150 door handle
5     investigation got turned over to I thought the
6     general counsel's office at Ford.  And my
7     recollection is that Kim Bowen-Adair was involved in
8     that transfer, and I could be wrong.
9          Q.    At what point in time?
10               MR. BELL:  Would you like me to point
11    out something for brevity purpose?
12               THE DEPONENT:  No, that's fine.
13    BY MR. JOSEY:
14         Q.    At what point in time?
15         A.    You know, in my mind's eye, I saw her
16    at some early point as he's leaving and these
17    documents are coming in knowing about the documents
18    being aware of the documents.
19         Q.    As Salmon is leaving Dearborn?
20         A.    To go to Cincinnati or wherever his
21    family moved to.
22         Q.    So you believe that he produced this
23    cabinet of documents as he's leaving Dearborn to go
24    to Cincinnati?
25         A.    Well, I don't -- look, I wasn't there,

11    documents are kind of being produced simultaneously

12    in Texas and South Carolina.

13         Q.    These documents were produced in

14    Guzman; were they not?

15         A.    I haven't gone item by item.  I

16    believe that a lot of door latch documents were.  In

17    fact, there was discovery -- joint discovery at some

18    point agreement in Guzman, but I also believe that

19    there may have been some documents that showed up in

20    one place that the other side -- that people in say

21    South Carolina -- showed up in Texas and South

22    Carolina didn't have or vice versa.

23         Q.    For how long a period of time; a day?

24         A.    I don't know.

25         Q.    You would agree with me that the

□

1    mechanics are such that something might arrive in

2    production one day in Texas?

3         A.    Yeah, Federal Express is not obligated

4    to deliver things simultaneously around the country

5                    (A recess transpired.)

6    BY MR. JOSEY:

7         Q.    Have you read the -- in these

8    materials, the transcript of Magistrate Judge Tom

9    Rogers May 19th hearing, May 19th of this year?

10        A.    I don't think that's in here.

11        Q.    That would be the hearing where he

12    allowed the service of questions directed to Kim

13    Bowen-Adair.  Have you read that?

14      A.    No, I haven't read that.

15      Q.    One of your opinions was that you

16  thought Ford had been evasive by not having them

17  personally answer those interrogatories?

18      A.    That wasn't my opinion.  My opinion

19  was that the answers are evasive, some of them,

20  and -- or nonresponsive and that they should have

21  personally signed their own interrogatory answers.

22      Q.    And not having read the transcript of

23  Judge Rogers, what's that based on that they should

24  have signed those?

25      A.    It's based on my discussion with

1  plaintiffs' counsel.

2      Q.    Have you been asked to assist with or

3  consult on the preparation of a sanctions motion in

4  this case?

5      A.    No.  I'm aware that they may be making

6  one, but I'm not a lawyer.  I'm a witness, and I'm

7  aware that there's a possibility that what I say

8  might be relevant to that, but I'm not helping them

9  on any sanctions motion.

10      Q.    You mentioned earlier something about

11  having an answer stricken in this case as a result

12  of what you've concluded as discovery abuse.  Have

13  you heard counsel say that that is a goal for them?

14      A.    That's -- that is on a menu of

15  possible outcomes I believe.  I don't know that that

16  is the goal.  I don't think that they would be very

17      sorry to see the answers stricken.

18              Q.      But did that -- did your menu of

19      possible things come up in a discussion with

20      plaintiff's counsel?

21              A.      It did.

22              MR. JOSEY:   Ed, I think I might take

23      you up on that offer a few minutes earlier to locate

24      a place where Jim Salmon's -- I assume that's within

25      the notebooks he has.

1               MR. BELL:   It may or may not be.  As I

2       recall, and I stand to be corrected, either in

3       Salmon's deposition in Guzman or somewhere else, he

4       may have testified he gave these documents to Adair

5       when he left I believe in December of 2000.  That's

6       my understanding, but I did not take the deposition,

7       but somewhere there.  Now, there is also a brief

8       filed by Ford -- I don't believe Professor Freeman

9       has seen that -- in Guzman whereas I recall,

10      again -- and I'll have to refresh my memory, but my

11      recollection is that Ford represented to the court

12      that Ms. Adair had looked at the documents on

13      September 3rd, '03, because there was a motion filed

14      against Ford for additional sanctions after Salmon

15      mentioned at his deposition he had this file cabinet

16      full of documents.

17              Then there was another memorandum or

18      the same memorandum that represented to the court

19      that those documents had previously been produced.

20    Later, Ford filed an amended motion -- or memorandum

21    that, basically, refuted its own prior memorandum

22    that some had been produced, some are not.

23              Are those things that you relied on in

24    reaching your opinions?

25              THE DEPONENT:  First, I did not get

1     his testimony in Guzman.  Secondly, I did get --

2     he's just refreshing me, but it's consistent with my

3     prior testimony that I was told when Salmon left, he

4     gave the documents to Adair, Bowen-Adair.  That may

5     not be true, but that was what I understood.  It's

6     what I testified to and it's what he just said.

7     BY MR. JOSEY:

8         Q.    And your source of information from

9     that was Mr. Bell?

10        A.    That's right.  I don't have the

11    Salmon --

12        Q.    If you have something that says that,

13    a document that says that Kim Bowen-Adair had the

14    documents in 2000, I'd like to see it.

15              MR. BELL:  Tell you what I'll do --

16              MR. JOSEY:  I'm asking him.

17              MR. BELL:  I understand, but just

18    because you asked me, I will locate if possible

19    those things and furnish them to both you and

20    counsel -- I mean you and Mr. Freeman to make sure

21    my memory is correct.

22    BY MR. JOSEY:

23          Q.    I want to know if he had them as we

24    sit here today, that's been the basis of your

25    opinion as you sit here today?

1          A.    No.  I gave you the basis.  I told you

2    I didn't have his testimony.  There's one other --

3    since we're talking about Salmon I believe is how

4    it's pronounced, there's one other aspect that I

5    want to be sure you're aware of, and that is that at

6    the time that plaintiffs had no either zero or very

7    few 6J01/6J08 documents, Mr. Bell had a colloquy,

8    which you may or may not know about, with Mr. Smith

9    saying that he wanted to take Salmon's deposition.

10              And he was told that Salmon had

11    nothing to do with this.  Didn't know anything about

12    it.  That if he tried to take the deposition, he

13    would be greeted by a motion for sanctions for

14    harassing Ford, that they would make available to

15    him Salmon's deposition I believe in Fipps, but I

16    could be wrong on that, and this guy doesn't have

17    anything, doesn't know anything.  You're abusive in

18    trying to get anything, and that is a fact that I

19    take into account in my analysis.

20          Q.    And that is a information that was

21    relayed to you by counsel?

22          A.    Right, concerning information imparted

23    to him allegedly from Mr. Smith in a taxicab

24    conversation.

25          Q.    Can you tell me what discovery request

Page 104

25     a bad question.  It may be a mediocre question, but,

1      you know, that's what you're suppose to do in
2      discovery, not answer a different question or say
3      what the heck you feel like saying, and she knows
4      that.
5              "Please describe all efforts you have
6      undertaken personally to comply with this court's
7      order of September 2003.  Under the direction of
8      Ford employees, I have interviewed numerous
9      employees, collected numerous documents and made
10     good faith efforts to comply with Ford's discovery
11     obligations in this case, including the agreed to
12     order dated September 2003."  That's, you know,
13     broad, unduly burdensome, so forth.  Just vague.
14             "Identify all Ford office of general
15     counsel attorneys" -- there's an error here, from
16     whom have given you direction -- "who have given you
17     direction at any time.  Wording is confusing," she
18     says.  It's true.  "I worked at the direction of
19     various attorneys."  You know, have a nice day.  You
20     didn't know before, you don't know now.  I ain't
21     telling you.  That's not proper.  She knows that.
22     Whoever helped her on this knows that.  That's just
23     wrong.
24             "Identify the first date you actively
25     participated in the Ford sweep for documents

1    responsive to plaintiff's discovery request."  Now,
2    what I understand, based on counsel, is a forward
3    sweep for documents is a term of special
4    significance to Ford that doing a document sweep has
5    special meaning.
6              Q.    what's the basis of that
7    understanding?
8              A.    Counsel telling me that when they do a
9    sweep -- you remember --
10             Q.    Counsel, Mr. Bell?
11             A.    Yeah, Mr. Bell.  In the September 2003
12   agreement, the word "sweep" is used all the time.
13   we're going to do a sweep.  we're doing a sweep and
14   all that.  And, you know, I had read that consistent
15   use of that one term, you know, kind of stuck with
16   me.  And then he told me that that's a special term
17   of art in their protocol at Ford.  And that term is
18   used here, "a Ford sweep for documents."
19             Q.    Have you never heard the term sweep
20   used in any other case or context?
21             A.    It can be used in an informal way.
22   That's why my ears perked up.  when he told me that
23   it had a special term, because I had already seen it
24   being used so many times in those September 2003
25   related documents, and, in fact, I spoke with him

⬜

1    about this particular interrogatory answer because

2   he explained to me here that they were asking --

3   using the term that she well understood, what I

4   understand --

5           Q.    What did Mr. Bell tell you the meaning

6   of sweep is to Ford as compared to common

7   understanding?

8           A.    He just told me it was a term that

9   they used in house when they go looking for things.

10  Doing a sweep is a certain protocol that they have.

11  I could be wrong on that.

12          Q.    Did he tell you what the protocol was?

13          A.    He didn't get into the A to Z.   He

14  just told me that.

15          Q.    Isn't that the ordinary meaning of

16  sweep in the context of litigation document

17  searches?

18          A.    You know, the truth is I don't know

19  the ins and outs of what a Ford sweep is and how it

20  might relate to what other people would say is a

21  search or, you know, a review or whatever they might

22  call it.  But I do know this:  The question is the

23  first date you actively participated in a sweep, all

24  documents you took possession of and from whom.

25  It's just not answered.  You know, I've interviewed

☐

129

1   employees, I've collected documents, I'm not telling

2   you what documents.

3           Q.    You're paraphrasing the answer now?

4           A.    Yeah.  I mean where is the detail

Page 116

2          Q.    I handed you that list just to see if

3     that refreshed your recollection of any -- of those

4     experts.  Those aren't your -- you weren't the

5     counsel in those cases.

6          A.    No.

7          Q.    You don't have any information that

8     Bringhurst or Medina, for example, involved a

9     painted door handle with a weak spring; do you?

10         A.    I think that there were PN96 cases or

11    else why would they -- again, my recollection is

12    that they surfaced in the CCRG materials.  They

13    wouldn't be in there unless --

14         Q.    It is your information that all PN96's

15    have weak springed handles or --

16         A.    No, I think springs have been fixed in

17    some of these recently.  As of a certain time, they

18    made adjustments.

19         Q.    So again, you don't have enough

20    information to say that this recent discovery of

21    documents would effect the value in Bringhurst or

22    Medina; do you?

23         A.    I believe -- I believe that they

24    predate all this disclosure.  I believe that they

25    were settled at a time when the lid was sealed, and

▯

150

1     if Ford thinks -- wants to show that that's untrue

2     and open Bringhurst and Medina, I would apply that.

3          Q.    My question is:  You don't even have

4     enough information to say these documents are

Page 135

5    relevant to the facts of those accidents; do you?

6         A.    Yeah, they're in the CCRG, and I have

7    every reason to believe that they're relevant.

8         Q.    You've mentioned Rule 5.1, Rule 5.3.

9    I think earlier you mentioned Rule 1.6, and feel

10   free to -- can you tell me what other rules have

11   come into play in your analysis?

12        A.    Well, I listed them just the quickest

13   way is if I can dig in here and find them.    3.1.

14        Q.    Is that something we forgot to mark?

15        A.    No, it's in here.    I brought two

16   copies of it.    I don't mind you marking this just to

17   be on the safe side.

18        Q.    Go ahead.

19        A.    "Lawyer shall not assert or controvert

20   an issue unless there's a basis for doing so that is

21   not frivolous."

22        Q.    Defendant's Exhibit 8?

23        A.    Right.    And in telling somebody that

24   there's no 6J01 6J08 doesn't have anything to do

25   with this.    Salmon doesn't have anything to do with

1    this.    You can take his deposition, we're going to

2    sanction you.    You know, if you don't know what

3    you're talking about, you shouldn't say anything,

4    and if you do know what you're talking about, you

5    shouldn't lie.

6              3.2, expediting litigation.    I believe

7    there's a duty and you know that there's an ethical

8  duty to expedite, and that is which is to say not to

9  be dilatory and constantly if you go through the

10  material, you see plaintiffs being attacked for

11  being dilatory, dragging their feet, not doing their

12  work da, da, da, da, da statement, documents are

13  being withheld secretly from them or documents are

14  not being produced to them.

15          3.4, fairness to opposing counsel is

16  relevant.  Obstructive tactics in the discovery

17  procedure.  3.4 again, I think that is in there.

18  8.4(c) conduct prejudicial to the administration of

19  justice.  There's another 8.4 rule which I believe

20  was on Mr. Smith's mind when he wrote his retraction

21  letter in November.  The other 8.4 rule is 8.4 (d),

22  lawyer shall not engage in conduct involving

23  dishonesty, fraud, deceit or misrepresentation.  And

24  that goes to him withdrawing his letter which is a

25  polite way of saying that letter is wrong, it's

1  bogus and withdrawing of Wheelock's affidavit.

2          Q.    And, again, your opinion was formed

3  without the benefit of any direct information from

4  Mr. Smith about his withdrawal?

5          A.    True, as I rest on my prior testimony.

6          Q.    I think I may be through.

7          MR. BELL:  Want me to ask some

8  questions, and if you have anymore, you can follow

9  up?

10          MR. JOSEY:  Okay.

11                     EXAMINATION

12   BY MR. BELL:

13          Q.    Mr. Freeman, is it your understanding

14   at this stage that the information you've received

15   from our office, as well as the documents, that

16   while Joel Smith's involvement made certain

17   representations that later turned out to be false,

18   that you were getting that information from Ford and

19   relying on his client to give him accurate

20   information?

21                 MR. JOSEY:  Object to the form of the

22   question.

23                 THE DEPONENT:  That's my

24   understanding.

25


⧠

1   BY MR. BELL:

2          Q.    And there's no allegation at this time

3   or against Mr. Smith that he has done anything

4   improper or unethical because his client lied to

5   him?

6                 MR. JOSEY:  Object to the form of the

7   question.

8                 THE DEPONENT:  I'm not attacking

9   Mr. Smith personally.

10   BY MR. BELL:

11          Q.    Now, if you don't mind, I'm going to

12   go back through, in a backwards form, some areas

13   that may have been asked and let me ask you a couple

                      **Page 138**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
FLORENCE DIVISION

| | | |
|---|---|---|
| ZACHARY STRICKLAND, JERRY I. STRICKLAND AND MARSHA STRICKLAND, | ) ) ) ) | Civil Action No.: 4:00-1391-23 |
| Plaintiffs, | ) ) | |
| v. | ) ) | |
| FORD MOTOR COMPANY AND FAIR BLUFF MOTORS, INC., | ) ) ) | |
| Defendants. | ) | |

## PLAINTIFFS' SUPPLEMENTAL RULE 26 EXPERT DISCLOSURES

Pursuant to Federal Rule 26 and the parties agreements, the Plaintiffs hereby amend and supplement their previous disclosures as set forth herein. Based upon information and documents identified to date, as well as discovery conducted to date in this case, Plaintiffs hereby designate and disclose the following experts and areas of expected testimony Plaintiffs intend to offer into evidence upon the trial of this matter:

I.    LIABILITY EXPERTS

   1.    Woodrow W. Poplin, P.E.
         Poplin Engineering
         Charleston, SC

Mr. Poplin is expected to give expert testimony in the areas of accident reconstruction and the cause(s) of the accident. Specifically, Mr. Poplin will testify to the direction of forces, as well as accelerations on the vehicle, seatbelt, passenger door and the occupant's and truck's response thereto. He will also explain the accident sequence and will provide a



-1-

Mr. Whitfield will discuss what statistical data and information is available to Ford at various points in time through publicly available sources, as well as internal Ford sources. Mr. Whitfield may discuss the statistical significance of publicly available data as it relates to the alleged defects in the Strickland vehicle. Mr. Whitfield may also discuss the type of research and statistical data complied and analyzed by the Insurance Institute For Highway Safety and the National Highway Traffic Safety Administration. Mr. Whitfield will also review statistical data analyzed and compiled by Ford Motor Company's expert statistician, Rose M. Ray, Ph.D. Mr. Whitfield will testify about the data set utilized by Rose M. Ray, Ph.D., as well as methodology of analysis. All prior disclosures, answers to interrogatories and his depositions are also incorporated herein by reference to this disclosure.

> 8. Professor John P. Freeman
> University of South Carolina, School of Law
> 701 S. Main Street, Law Center 406
> Columbia, SC 29208

Professor Freeman is reviewing data concerning, and may testify about Ford's conduct in responding to discovery requests and court orders concerning discovery. Specifically, Professor Freeman may opine on the propriety of Ford's actions or inaction relating to the Hayward litigation discovery in the context of the standards of truthfulness, fair dealing, punctuality, and professionalism under the Rules of Professional Conduct applicable to lawyers involved in matters in Federal District Court in South Carolina.

> 9. Mr. Keith Radak
> Senior Reliability Analyst
> Detroit Diesel
> 13400 West Outer Drive
> Detroit, MI

Keith Radak is a reliability analyst for Detroit Diesel company and is part of the reliability department at Detroit Diesel. Part of Mr. Radak's job involves design and analysis of

## CERTIFICATE OF SERVICE

I hereby certify that a true and accurate copy of the foregoing PLAINTIFFS'
SUPPLEMENTAL RULE 26 EXPERT DISCLOSURES was served via regular U.S. Mail,
postage prepaid, and via facsimile on this 19th day of April 2004 to the following counsel of
record:

> John S. Wilkerson, III
> TURNER, PADGET, GRAHAM & LANEY, P.A.
> Post Office Box 22129
> Charleston, SC 29413
> Tel:    (843)576-2800
> Fax:    (843)577-3369
>
> Rosewell Page, III
> J. Tracy Walker, IV
> McGUIREWOODS, LLP
> One James Center
> 901 East Cary Street
> Richmond, VA 23219-4030
> Tel:    (804) 775-1000
> Fax:    (804) 775-1061

GAMAE M. THORNTON

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA

FLORENCE DIVISION

| | | |
|---|---|---|
| Zachary Strickland, Jerry I. Strickland and Marsha Strickland Plaintiff | ) ) ) ) | |
| v. | ) ) | Civil Action No.: 4:00-1391-23,25BH |
| Ford Motor Company and Fair Bluff Motors, Inc. | ) ) ) | |

## PLAINTIFFS' MOTION TO COMPEL THE DEPOSITION OF ROBERT WHEELOCK UNDER COURT SUPERVISION IN FLORENCE, SOUTH CAROLINA

Plaintiff moves this court for an order directing Defendant Ford to produce Robert Wheelock for deposition in Florence, South Carolina on or about one day during the week of May 24, 2004 (or such other time convenient to the Court) in order that this deposition can be attended, monitored and objections ruled upon timely and in context during the deposition by the Honorable Thomas E. Rogers, III.

The basis for Plaintiffs' motion is that Plaintiffs have a reasonable belief that they will be able to show that Mr. Wheelock has committed perjury through testimony in deposition and affidavit filed in this case, as well as has assisted the Defendant Ford in hiding critical discovery information in this case. Plaintiffs further have reason to believe that these actions were performed by Mr. Wheelock in association with, or at the direction of, members of the Office of General Counsel of Ford which directly misrepresented and misled Ford's former counsel Nelson, Mullins, Rollins & Scarborough who in turn made misrepresentations to Plaintiffs and this Court related to doorlatch discovery related issues..

Plaintiff anticipates that Ford may interpose objections based on claims of privilege which need be heard by the court at the time the questions are posted and immediate rulings made thereon.

LAW OFFICES OF J. EDWARD BELL, III, LLC

1



ATTACHMENT
C

By: _____
    J. Edward Bell, III
    Federal ID # 1280
    Kevin R. Dean
    Federal ID # 8046
    P.O. Box 2590
    Georgetown, South Carolina 29442
    TEL 843/546-2408
    Attorneys For Plaintiffs'

MOTLEY & RICE, LLC

By: _____
    Joseph F. Rice
    Federal ID #4710
    Rhett D. Klok
    Federal ID # 8050
    Frederick J. Jekel
    Federal ID# 6465
    28 Bridgeside Blvd.
    P.O. Box 1792
    Mount Pleasant, SC 29464
    TEL 843/216-9000
    FAX 843/216-9430

May 11, 2004
Georgetown, South Carolina

CERTIFICATE OF MAILING

I hereby certify that the foregoing pleading was mailed
and faxed to all counsel of record in this proceeding on this 11th
day of May, 2004.

2

1   UNITED STATES DISTRICT COURT

2   DISTRICT OF SOUTH CAROLINA

3   FLORENCE DIVISION

4   ZACHARY STRICKLAND, ET AL.,          )
                                         )
5                   PLAINTIFFS,          )        CIVIL ACTION
                VS.                      )        NO. 4:00-1391
6                                        )
    FORD MOTOR COMPANY,                  )
7                                        )
                    DEFENDANT.           )
8   ------------------------------X
                                         )
9
                                     UNITED STATES COURTHOUSE
10                                   FLORENCE, SOUTH CAROLINA
                                     WEDNESDAY, 10:00 A.M.,
11                                   MAY 19, 2004.

12                          -    -    -

13  TRANSCRIPT OF MOTION HEARING PROCEEDINGS

14  BEFORE THE HON. THOMAS E. ROGERS III, MAGISTRATE JUDGE

15                          -    -    -

16  APPEARANCES:

17              KEVIN R. DEAN, ESQ.
                J. EDWARD BELL III, ESQ.
18              SUMTER, SOUTH CAROLINA
                FREDERICK J. JEKEL, ESQ.
19              CHARLESTON, SOUTH CAROLINA
                FOR THE PLAINTIFFS.
20
                J. RENE' JOSEY, ESQ.
21              FLORENCE, SOUTH CAROLINA,
                JOHN S. WILKERSON, ESQ.
22              CHARLESTON, SOUTH CAROLINA
                ROSEWELL PAGE III, ESQ.
23              RICHMOND, VIRGINIA
                FOR THE DEFENDANTS.
24
    PROCEEDINGS RECORDED ELECTRONICALLY
25  COMPUTER-AIDED TRANSCRIPTION BY VINCE ROLLAND
    P O BOX 2317 FLORENCE SC 29503 843-615-1654



ATTACHMENT
D

1   ASSIST IN THAT CASE AND WE DID, WE WENT DOWN AND TRIED
2   THAT CASE.

3       BECAUSE OF MOTION HEARINGS BEFORE THE STATE JUDGE
4   DOWN THERE -- LET ME STOP A SECOND.

5       PRIOR TO THAT INVOLVEMENT, WE HAD RECEIVED AN
6   EXTENSIVE PRIVILEGE LOG FROM FORD.  JAY LOGEL'S NAME WAS
7   ALL OVER THAT PRIVILEGE LOG.  WE STARTED LOOKING INTO
8   THIS PRIVILEGE LOG, AND PRIOR TO SOME HEARINGS, AND SOME
9   IN TEXAS, FORD STARTED DECLASSIFYING PRIVILEGED DOCUMENTS
10  THAT WE REALIZED WERE NEVER PRIVILEGED TO BEGIN WITH.

11      ONE OF THE MOST DAMAGING DOCUMENTS WAS A DOCUMENT
12  JAY LOGEL WAS INVOLVED IN THAT HAD TO DO WITH THE
13  ANALYSIS OF 12 CRASH TESTS.  THIS 12 CRASH TESTS, AND
14  I'LL SHOW IT TO YOU RIGHT HERE, YOUR HONOR, THE BATES
15  STAMP NUMBER IS NOT ON IT, BUT IT'S DATED 11-15-2000.

16      MR. PAGE:  YOU SAID LOGEL WAS INVOLVED WITH THAT?
17      MR. BELL:  I DON'T KNOW IF HE WAS INVOLVED, BUT
18  I'LL READ IT TO THE COURT.

19      MR. WILKERSON:  JUDGE, FOR THE RECORD, WE DON'T
20  HAVE THAT DOCUMENT BEFORE US IN THE COURTROOM, SO WE'RE
21  AT A DISTINCT DISADVANTAGE.

22      THE COURT:  WELL, I'M SITTING UP HERE, AND IT
23  CHAPS ME BECAUSE OF ALL THIS STUFF YOU'RE GOING INTO.  I
24  LIKE TO READ THINGS BEFORE I GET IN HERE SO I HAVE SOME
25  IDEA WHAT I'M DEALING WITH.  AND YOU ARE TALKING ABOUT

1    ALL KIND OF THINGS, MAKING ACCUSATIONS, SAYING THINGS AS

2    A FACT, AND IT MIGHT BE SO, BUT I DON'T KNOW THAT TO BE

3    THE CASE.  AND IT PUTS ME IN A TOUGH SITUATION TO TRY TO

4    REMEMBER EVERYTHING THAT YOU'RE GOING THROUGH RIGHT NOW,

5    WHEN IT'S NOT IN YOUR BRIEF.

6        MR. BELL:  JUDGE, WITH ALL DUE RESPECT, AND I

7    PROBABLY SHOULD HAVE UPDATED THE BRIEF, BUT THAT

8    PARTICULAR DOCUMENT YOU'RE LOOKING AT NOW HAD NOT BEEN

9    DISCLOSED TO US AT THE TIME WE FILED OUR BRIEF.

10       THE COURT:  WELL, THIS IS ONE OF A BUNCH OF THINGS

11   YOU'RE TALKING ABOUT, THIS THING ABOUT JOEL SMITH AND HE

12   SAID FORD LIED, YOU'RE MAKING SOME PRETTY SERIOUS

13   ACCUSATIONS, AND --

14       MR. BELL:  JUDGE, WE HAVE NOT ONLY MADE THOSE

15   ACCUSATIONS, BUT THE AFFIDAVIT --

16       THE COURT:  I DON'T WANT TO GET INTO THE TRUTH OF

17   THEM, BECAUSE YOU MAY HAVE EVERYTHING LAID OUT.  DON'T

18   GET ME WRONG, I'M NOT CRITICIZING YOU FOR DOING WHATEVER

19   YOU THINK YOU OUGHT TO DO, BUT THE FACT REMAINS, I COME

20   IN HERE WITH THIS MOTION, AND Y'ALL FILED A MEMORANDUM.

21   THEY FILED A RESPONSE.  SOME OF THESE MOTIONS THAT WE

22   HAVE TODAY, THE TIME FOR FILING RESPONSES IS NOT, HASN'T

23   EXPIRED, BUT I AGREED TO DEAL WITH THEM, PROVIDED WE

24   DIDN'T HAVE A PROBLEM WITH THAT.

25       BUT YOU KNOW, I -- I'M TEMPTED TO TELL YOU I'M NOT

1    ISSUE, BUT I RISE FOR THE SOLE PURPOSE OF ADDRESSING MR.

2    BELL'S VERY ELABORATE AND DETAILED JURY ARGUMENT TO THE

3    COURT, THAT HE JUST PRESENTED TO THE COURT, WHAT HE

4    PRESENTED TO BE FACTUAL STATEMENTS, STARTING FROM A TO Z,

5    GETTING TO THE POINT WHERE HE BELIEVES HE'S ENTITLED TO

6    THESE THINGS.

7    THE COURT:  I UNDERSTAND, I'LL LET YOU PUT

8    WHATEVER YOU WANT TO ON THE RECORD.  I'M NOT GOING TO

9    CONSIDER ANY OF THAT, BECAUSE THAT IS UNFAIR TO ME, IN

10   TRYING TO MAKE A DECISION, AND MAKING FACTUAL ASSERTIONS

11   AND ACCUSATIONS LIKE THAT, I'M NOT GOING TO CONSIDER

12   ANYTHING THAT IS NOT IN THE BRIEF.

13   THE RULES PROVIDE THAT YOU SHOULD PUT IT IN THERE,

14   SO I'M NOT GOING TO CONSIDER THAT.

15   MR. WILKERSON:  I APPRECIATE THAT, YOUR HONOR, AND

16   PART OF MY STANDING UP WAS GOING TO BE TO MOVE TO STRIKE

17   THAT CLOSING ARGUMENT THAT MR. BELL JUST MADE, AND MOST

18   IMPORTANTLY, IF YOUR HONOR PLEASE, WITH REGARD TO THE

19   ABSENT MR. JOEL SMITH, WHO AS THE COURT KNOWS, CARRIES

20   JUST AN UNTARNISHED REPRESENTATION IN THIS STATE AND

21   PERHAPS IN THE COUNTRY AS A FINE TRIAL LAWYER, HE'S MADE

22   REPRESENTATIONS AS TO WHAT MR. SMITH ALLEGEDLY TOLD TO

23   HIM, AND I JUST WANT TO MAKE SURE THAT THE RECORD IS

24   CLEAR.

25   MR. SMITH HAS OFFERED TO ME TO PRESENT TO THE